Thomas J. CIRCO, Appellant,

v.

A–CORD ELECTRIC, Respondent.

No. WD 54199.

Missouri Court of Appeals,
Western District.

April 28, 1998.

P. Thomas Loughlin, Kansas City, for appellant.

James W. Humphrey, Jr., Stigall, Humphrey Lucas, Henry, Stigall & Dollar, Kansas City, for respondent.

Before LOWENSTEIN, P.J., and BRECKENRIDGE and HANNA, JJ.

BRECKENRIDGE, Judge.

Thomas J. Circo appeals the order of the Labor and Industrial Relations Commission adopting the award of the Administrative Law Judge which denied his claim for workers' compensation benefits because he did not sustain an "injury by accident" as defined by § 287.020, RSMo 1994.[1] The Commission did not err in its application of § 287.020, because Mr. Circo's injury did not arise out of and in the course of his employment. The order of the Commission is affirmed.

When reviewing the disposition of a workers' compensation claim, this court views the record, and any reasonable inferences drawn therefrom, in the light most favorable to the Commission's decision. *Davis v. Research Medical Center,* 903 S.W.2d 557, 565 (Mo.App.1995). At the time of the incident, Mr. Circo, an electrician, was employed by A–Cord Electric (A–Cord). He had worked as an electrician for twenty-five years, and had been employed by A–Cord as a journeyman wireman for two years. His duties as a journeyman wireman included running pipe, pulling wire, installing light fixtures, climbing, and digging ditches.

On September 28, 1995, Mr. Circo was working at the H & R Block building on Main Street, near the Plaza in Kansas City. His job that day was to help make a wire pull, which involved installing wire to service the entire building. In the afternoon, Mr. Circo was walking down a fairly steep gravel incline outside the building when his left leg buckled underneath him. Mr. Circo heard and felt a pop in the cartilage in his left knee. He fell down and laid there until someone came to help him stand up, and then he sat down for a while.

Mr. Circo described the pain he felt after the incident as a "sharp burning sensation ... like little jagged stabs" in his knee. He also said his knee began to swell. Mr. Circo reported the incident to his supervisor immediately after it happened. He remained at work for the rest of the afternoon, operating the radios.

The next day Mr. Circo sought medical attention for his knee from Dr. James Whitaker, after notifying A–Cord that he planned to do so because he was in a lot of pain and could not walk. Three days later, on October 2, Dr. Whitaker performed arthroscopic surgery on Mr. Circo's left knee. Mr. Circo developed an infection in his knee, and had two subsequent surgeries. After the surgeries, Mr. Circo's treatment consisted of followup appointments with Dr. Whitaker, and participating in swim therapy and physical therapy several days a week for a month.

On October 23, 1995, Mr. Circo filed a claim for workers' compensation benefits with the Division of Workers' Compensation. In response, A–Cord admitted that he was its employee at the time of the incident and that he was working under the provisions of the workers' compensation law. However, A–Cord denied Mr. Circo's allegations that he suffered an injury that qualified him for past and future medical aid, and past and ongoing temporary total disability benefits.

---

1. Statutory references are to the Revised Statutes of Missouri 1994, unless otherwise indicated.

On June 27, 1996, a hearing was held on Mr. Circo's claim before an administrative law judge. As of the hearing, Mr. Circo had incurred medical expenses in the amount of $27,943.50. In support of his claim, Mr. Circo presented his own testimony, his medical records and a narrative report from Dr. Whitaker's office.

Both Mr. Circo's testimony and Dr. Whitaker's medical records indicate that Mr. Circo had a history of problems with his left knee. Dr. Whitaker had been treating Mr. Circo for problems associated with his left knee since November of 1982, after Mr. Circo had heard a "pop" while riding his bike in May of that year. On November 13, 1982, Dr. Whitaker performed arthroscopic surgery on his left knee. At that time, Dr. Whitaker found that Mr. Circo suffered from medial and lateral meniscal tears.

On November 1, 1994, Mr. Circo sought treatment on his left knee from his family doctor, Dr. Gialde. Dr. Gialde found a Baker's cyst on the back of his knee, which he attempted to aspirate and injected with a steroid. On November 21, 1994, Mr. Circo returned to Dr. Whitaker, complaining of a one-month history of left knee pain. Dr. Whitaker x-rayed the knee, and diagnosed Mr. Circo with moderate arthritis in the joint. Dr. Whitaker also found that Mr. Circo had fluid on the knee, which indicated to him that the joint was inflamed. Dr. Whitaker believed that Mr. Circo had several options for treatment, including arthroscopic surgery on the knee. Opting for a conservative approach, Dr. Whitaker prescribed anti-inflammatory medication and strengthening exercises. On November 28, 1994, Mr. Circo returned to Dr. Whitaker, complaining that stair climbing had aggravated his knee. During that appointment, Dr. Whitaker noted that Mr. Circo continued to have inflammation in the joint and also some wearing of the cartilage. Dr. Whitaker aspirated the knee and injected it with local anesthetic and a corticosteroid preparation. Dr. Whitaker indicated that if Mr. Circo continued to have pain in his knee, he may need to have it arthroscoped. On December 5, 1994, Dr. Whitaker and Mr. Circo had a telephone conference, during which Mr. Circo told Dr.

Whitaker that his knee had improved, but it was still tender. In his notes from that conversation, Dr. Whitaker recorded that he advised Mr. Circo that "we may need to arthroscope the knee."

Mr. Circo's next appointment with Dr. Whitaker was on March 3, 1995. Mr. Circo complained of aggravated pain on a persistent basis and swelling in his left knee due to his crawling on the job. Dr. Whitaker advised Mr. Circo that the swelling in the knee was a sign that the joint was irritated, and that he might have a cartilage tear in the knee. Dr. Whitaker aspirated and injected the knee with a steroid, and again noted that if Mr. Circo's knee continued to bother him, he may need to have the knee arthroscoped. Dr. Whitaker told him to limit the amount of crawling and squatting he does at work. Mr. Circo returned to Dr. Whitaker on July 3, 1995, reporting a two-week history of pain and swelling his left knee. Dr. Whitaker told Mr. Circo he had inflammation in the joint, and that "he very probably will need to have his knee arthroscoped but he will be the one deciding when." Dr. Whitaker again aspirated the knee, and tentatively scheduled surgery should Mr. Circo's symptoms persist. Dr. Whitaker's records indicate that he had a telephone conference with Mr. Circo on September 26, 1995, during which Mr. Circo told him that his left knee had improved. Dr. Whitaker also noted that Mr. Circo's surgery was cancelled.

Mr. Circo returned to Dr. Whitaker on September 29, 1995, one day after the incident at work. He told Dr. Whitaker that his knee "buckled on him and gave way" when he was walking down a gravel incline. Dr. Whitaker x-rayed the knee, and found that the x-rays had "not changed all that much." In his notes, Dr. Whitaker recorded that he felt "it would be best to proceed with the arthroscopy at this time with his history of recurrent problems." Dr. Whitaker performed arthroscopic surgery on the knee on October 2, 1994. He diagnosed Mr. Circo with medial and lateral meniscal tears with associated arthritic involvement in his left knee. After the surgery, Mr. Circo developed an infection in the knee, and had two subsequent surgeries.

The medical records from Dr. Whitaker's office offered into evidence by Mr. Circo included a narrative report which summarized the history of Mr. Circo's treatment. In the report, Dr. Whitaker opined that Mr. Circo's job injury on September 28, 1995 was a substantial factor in the causation of his left knee condition. Dr. Whitaker concluded that the injury resulted in Mr. Circo's surgery and the post-operative infection.

A–Cord's evidence consisted of the deposition testimony and a letter from Dr. Thomas Phillips and a letter from Dr. Scott Steelman. A claims representative from Builders' Association Self–Insurers' Fund had requested that Dr. Phillips review Dr. Gialde's and Dr. Whitaker's medical records regarding Mr. Circo, as well as parts of Mr. Circo's deposition, and render an opinion as to whether the incident on September 28, 1995 was the substantial contributing factor for the surgery performed on October 2, 1995. Dr. Phillips opined that, based upon Mr. Circo's previous history and the arthroscopic findings at the surgery, the accident did not substantially contribute to the surgery. In his opinion, Mr. Circo's condition had developed over time and was not related to any one event. Dr. Phillips testified that the Baker's cyst, which is swelling behind the knee, was an indication that there was an abnormality inside Mr. Circo's knee joint. Dr. Phillips believed the abnormality in Mr. Circo's knee was a combination of an arthritic condition that predated the September 28, 1995 accident, and a meniscal tear. Dr. Phillips also stated the internal derangement of Mr. Circo's knee could have caused the accident on September 28, 1995. In his opinion, the October 2, 1995 surgery would have been necessary regardless of the September 28, 1995 accident.

The claims representative from Builders' Association Self–Insurers' Fund also requested that Dr. Steelman review Mr. Circo's medical records from Dr. Gialde's and Dr. Whitaker's office and render an opinion as to whether the September 28, 1995 accident was the substantial cause of Mr. Circo's condition and need for surgery. In Dr. Steelman's opinion, Mr. Circo's preexisting left knee condition caused his knee to buckle and give way, resulting in further injury. Dr. Steelman based the opinion on his belief that "[i]ndividuals with torn cartilage in their knees frequently state that their knees buckle or give way." After hearing the evidence, the ALJ issued written findings of fact and conclusions of law denying Mr. Circo compensation.

In her order, the ALJ found that the evidence supported a conclusion that Mr. Circo's accident did not arise out of or in the course of his employment. The ALJ found that Mr. Circo needed surgery prior to the September 28, 1995 accident, and inferred that Mr. Circo staged the accident at work after he had "falsely advised Dr. Whitaker's office on the 26th that his knee had improved." Even if the accident triggered or hastened the surgery, the ALJ did not believe the accident was a substantial factor in his need for the surgery based upon Dr. Phillips' opinion. As an additional basis for denying Mr. Circo compensation, the ALJ found that Mr. Circo's fall was idiopathic in nature and did not arise out of or in the course of his employment based upon Dr. Steelman's opinion that Mr. Circo's fall was caused by his preexisting condition and not by any work conditions, and Dr. Phillips' opinion that the work conditions did not cause Mr. Circo's injury to his knee. The ALJ denied Mr. Circo's claim for compensation.

Mr. Circo filed an application for review with the Labor and Industrial Relations Commission, arguing that the ALJ erred in denying him compensation because his injury was a substantial factor in causing his subsequent surgeries, medical treatment, and temporary total disability. On April 4, 1997, the Commission affirmed the ALJ's award denying Mr. Circo compensation because the accident did not arise out of or in the course of his employment. The main opinion, signed by Commissioner Christian C.R. Wrigley, incorporated the ALJ's award by reference. Thus, Commissioner Wrigley agreed with the ALJ's findings that (1) Mr. Circo needed the surgery prior to the accident, and in fact staged the accident after falsely advising Dr. Whitaker that his knee condition had improved; (2) based upon the opinion of Dr.

Phillips, the accident merely triggered, but was not a substantial factor in, his need for surgery; and (3) Mr. Circo's fall was idiopathic in nature.

In a separate opinion, Commission Chairperson Christopher S. Kelly concurred with Commissioner Wrigley in finding that Mr. Circo needed the surgery prior to the accident and staged the accident, because Commissioner Kelly stated that he was "disinclined to second guess the administrative law judge's credibility call." However, Commissioner Kelly rejected Dr. Phillips' opinion because Dr. Phillips based his opinion only on a review of Mr. Circo's records and x-rays, and never examined Mr. Circo. Instead, Commissioner Kelly believed that expert opinion was not required to establish causation in this case because the slip-and-fall knee injury was not complex. Commissioner Kelly stated that he would have reversed the ALJ's denial of benefits had the ALJ believed Mr. Circo with regard to the issue of causation. Commissioner Kelly also rejected Commissioner Wrigley's finding that the fall was idiopathic in nature.

Commissioner Phillip M. Barry filed a dissenting opinion. Commissioner Barry disagreed with the finding that Mr. Circo staged his accident, as he did not believe that any evidence existed that Mr. Circo "falsely advised" Dr. Whitaker that his knee condition had improved and that he had cancelled surgery. Mr. Circo filed a timely appeal to this court.

Mr. Circo raises three points on appeal. In his first point, he contends that there was insufficient evidence for the Commission's denial of compensation. As his second point on appeal, Mr. Circo argues that the Commission's denial was against the weight of the evidence. Finally, in his third point, Mr. Circo alleges that the Commission's denial was erroneous because in his concurring opinion, Commissioner Kelly misapplied case law as it relates to the deference to be paid to the ALJ's credibility determinations.

### Standard of Review

The decision of the Commission may be modified, reversed, remanded for rehearing or set aside only if the Commission acted without or beyond its power, the decision was procured by fraud, the facts found do not support the award or the decision was not supported by sufficient competent evidence in the record. Section 287.495.1; *Abel v. Mike Russell's Standard Service*, 924 S.W.2d 502, 503 (Mo. banc 1996). An appellate court is bound by the Commission's findings of fact, and, when the Commission denies recovery, the court can set aside the Commission's decision only when it acted "without or in excess of its powers." *Abel*, 924 S.W.2d at 503. This review consists of a two-step review process:

> In the first step, the court examines the whole record, viewing the evidence and all reasonable inferences drawn therefrom in the light most favorable to the award, to determine if the record contains sufficient competent and substantial evidence to support the award. If not, the Commission's award must be reversed. If there is competent and substantial evidence supporting the award, the court moves to the second step, where it views the evidence in the light most favorable to the award, but must consider all evidence in the record, including that which opposes or is unfavorable to the award, take account of the overall effect of all of the evidence, and determine whether the award is against the overwhelming weight of the evidence.

*Davis*, 903 S.W.2d at 571.

### Sufficient Evidence Supports the Commission's Award

In his first point, Mr. Circo argues that there is insufficient evidence to support the Commission's denial of compensation based upon its conclusion that Mr. Circo's injury did not arise out of or in the course of his employment. For workers' compensation purposes, the terms "accident" and "injury" are defined in subsections 2 and 3 of § 287.020. The text of the relevant provisions of these subsections reads:

> 2. The word "accident" as used in this chapter shall, unless a different meaning is clearly indicated by the context, be construed to mean an unexpected or unforeseen identifiable event or series of events happening suddenly and violently, with or

without human fault, and producing at the time objective symptoms of an injury. An injury is compensable if it is clearly work related. An injury is clearly work related if work was a substantial factor in the cause of the resulting medical condition or disability. An injury is not compensable merely because work was a triggering or precipitating factor.

3. (1) In this chapter the term "injury" is hereby defined to be an injury which has arisen out of and in the course of employment. The injury must be incidental to and not independent of the relation of employer and employee. Ordinary, gradual deterioration or progressive degeneration of the body caused by aging shall not be compensable, except where the deterioration or degeneration follows as an incident of employment.

(2) An injury shall be deemed to arise out of and in the course of the employment only if:

(a) It is reasonably apparent, upon consideration of all the circumstances, that the employment is a substantial factor in causing the injury; and

(b) It can be seen to have followed as a natural incident of the work; and

(c) It can be fairly traced to the employment as a proximate cause; and

(d) It does not come from a hazard or risk unrelated to the employment to which workers would have been equally exposed outside of and unrelated to the employment in normal nonemployment life[.]

 When construing a statute, this court must give the language its plain and ordinary meaning to ascertain the intent of the legislature. *Cook v. St. Mary's Hosp.*, 939 S.W.2d 934, 938 (Mo.App.1997). Any doubts concerning the employee's right to compensation under the statutes must be resolved in favor of the injured employee. *Id.*

For an award to be valid, two Commissioners must agree on the award because two Commissioners constitute a quorum. § 286.010, RSMo Cum.Supp.1997; *Hogue v. Minact, Inc.*, 892 S.W.2d 758, 760–61 (Mo. App.1995). In this case, two of the Commis-

sioners agreed on the award and the conclusion Mr. Circo's injury did not arise out of or in the course of his employment. However, the only finding supporting the award upon which they both agreed was that Mr. Circo needed surgery prior to September 28, 1995, and staged the accident after falsely advising Dr. Whitaker that his knee condition had improved. Therefore, in this first step of the *Davis* review, this court will examine the whole record to determine if sufficient competent evidence supports the Commission's inference that Mr. Circo needed the surgery prior to September 28, 1995 and, in fact, staged the accident. *Davis*, 903 S.W.2d at 571.

 As the trier of fact, the Commission is permitted to draw reasonable inferences from the evidence, so long as the inferences are not based upon conjecture. *McMillin v. Payless Cashways, Inc.*, 897 S.W.2d 661, 664 (Mo.App.1995). This court will defer to the Commission's judgment on factual disputes regarding inferences, and will not substitute its own judgment. *Walls by Walls v. Allen Cab Co., Inc.*, 903 S.W.2d 937, 940 (Mo.App. 1995).

 The Commission's finding that Mr. Circo needed surgery prior to the September 28, 1995 incident is supported by substantial and competent evidence in the record, namely, Dr. Whitaker's records. Dr. Whitaker's records show that he first considered arthroscopic surgery to be an option for treating Mr. Circo during the November 21, 1994 examination. In his notes describing the November 28, 1994 appointment, Dr. Whitaker stated that if Mr. Circo continued to have pain in his knee, he may need to have it arthroscoped. In his entry regarding the December 5, 1994 phone conference, Dr. Whitaker wrote that he advised Mr. Circo that "we may need to arthroscope the knee." On March 3, 1995, Dr. Whitaker again stated in his notes that "[i]f the knee continues to bother him, he may need to have the knee scoped." On July 3, 1995, Dr. Whitaker's records show that he told Mr. Circo that he "very probably will have to have his knee arthroscoped but he will be the one deciding when."

The Commission's inference that Mr. Circo staged the accident is also supported by substantial and competent evidence. First, Mr. Circo testified that after the accident, he laid on the ground "for a little bit" until someone came to help him up. This implies that no one witnessed Mr. Circo's fall. Second, Mr. Circo's testimony minimalized the extent of his past medical treatment and was inconsistent with Dr. Whitaker's records, making Mr. Circo a less than credible witness. On cross-examination, the attorney for A–Cord asked Mr. Circo if he had had his left knee aspirated and injected on a number of occasions before the accident. Mr. Circo replied that he had only had it done "maybe once," and not on a number of occasions. Dr. Whitaker's records indicate that Mr. Circo had his knee aspirated and injected on November 1, 1994 by Dr. Gialde, and on November 28, 1994 and March 3, 1995 by Dr. Whitaker. Additionally, when asked on cross-examination whether he had ever discussed with Dr. Whitaker the possible need for arthroscopic surgery before the September 28, 1995 incident, Mr. Circo testified that he and Dr. Whitaker had "maybe" talked about "tentative surgery" only one time.

In fact, in his narrative report, Dr. Whitaker stated that, on July 3, 1995, tentative surgery was scheduled if Mr. Circo's symptoms persisted. Dr. Whitaker's records indicate that Mr. Circo advised him two days before the incident that his knee had improved, and the surgery was cancelled. If Mr. Circo did have surgery tentatively scheduled and then cancelled it two days before the accident, this supports the Commission's finding that he staged the accident at work. However, even if no surgery was tentatively scheduled, Dr. Whitaker's records indicate that the timing of the surgery was up to Mr. Circo. His call to Dr. Whitaker's office two days before the accident, for no reason other than to tell Dr. Whitaker that his knee condition had improved, is suspect. The Commission's finding that Mr. Circo needed the surgery prior to September 28, 1995, and in fact staged the accident, was supported by Dr. Whitaker's records and Mr. Circo's testimony. In turn, this finding supports the Commission's denial of compensation to Mr. Circo. Viewing the evidence and inferences therefrom in the light most favorable to the Commission's decision, the Commission's denial of benefits is supported by substantial and competent evidence in the record.

## The Commission's Award is not Against the Weight of the Evidence

In his second point, Mr. Circo argues that the Commission's award is against the overwhelming weight of the evidence. To determine whether the award is against the overwhelming weight of the evidence, this court is to consider all of the evidence in record, including that which is unfavorable to the award. *Davis*, 903 S.W.2d at 571.

■ The evidence contrary to the Commission's award is Mr. Circo's testimony, and Dr. Whitaker's opinion in his narrative report. Mr. Circo testified that as he was walking down the incline, the gravel gave way and his leg slid underneath him. He also testified that in his prior problems with his left knee, he had experienced different symptoms than those that he experienced after the September 28, 1995 incident. The pain after the September 28, 1995 incident was much sharper than he had felt before, and unlike in the past, he was not able to walk on his left knee. He testified that in the five years prior to September 28, 1995, he had only missed three days of work because of his knee problems. According to Mr. Circo, he was free of all symptoms from his prior left knee problems before the September 28, 1995 incident, and no surgery had been scheduled and then cancelled on September 26, 1995.

In drawing the inference that Mr. Circo staged the accident at work after falsely advising Dr. Whitaker's office two days earlier that his knee condition had improved, the ALJ effectively determined that Mr. Circo's testimony was not credible. Mr. Circo testified before the ALJ, who was able to observe his demeanor, and this court cannot ignore that the ALJ was in a more favorable position to judge his credibility. *Id.* at 569. Furthermore, the Commission's affirmance of the ALJ's determination of Mr. Circo's credibility favors upholding the Commission's award on appeal. *See id.* at 571.

The other evidence unfavorable to the Commission's award was Dr. Whitaker's medical opinion that the September 28, 1995 incident was a substantial factor in causing Mr. Circo's left knee condition. However, Dr. Whitaker's records also showed that he believed that the necessity of surgery on Mr. Circo's knee was "very probable" and, in fact, had advised Mr. Circo prior to the September 28, 1995 incident of this probability. Again, this is an issue involving the credibility of witnesses and the weight to be given to testimony, and this court will defer to the findings of the Commission. *Johnson v. Denton Const. Co., 911 S.W.2d 286, 288 (Mo. banc 1995)*. The Commission's award is not against the overwhelming weight of the evidence.

**The Commission Properly Considered the ALJ's Credibility Determinations**

In his final point on appeal, Mr. Circo claims that in his concurring opinion, Commissioner Kelly misapplied the *Davis* standard concerning the deference the Commission is to pay the ALJ's credibility determinations. In his concurring opinion, Commissioner Kelly stated that he would have reversed the decision of the ALJ denying Mr. Circo benefits, except that he was "disinclined to second guess the administrative law judge's credibility call." He then cited the following passage from *Davis*:

> [T]o say that the Commission is not *obligated* or *bound* to defer to the ALJ's credibility determinations is not to say they may be slighted or ignored, either by the Commission or the appellate court. Credibility is clearly a consideration for both the ALJ and the Commission, and the Commission should not make its credibility calls in a vacuum. Furthermore, in reviewing the award of the ALJ, the Commission should properly consider that the ALJ "had the witnesses before him and was thus in a position which gave him a great vantage ground over the members of the Commission who afterwards had [only] the opportunity of reading [a transcript] of the testimony." Moreover, the courts of this state have also expressly acknowledged that while the ALJ's findings may

not be conclusive or binding on either the Commission or the reviewing court, they are an important part of the whole record, "carry considerable weight, especially where there is a question as to the credibility of witnesses," and should be given due consideration along with all the other facts and circumstances of the case.

*Davis*, 903 S.W.2d at 569 (citations omitted). Mr. Circo argues that the ALJ never made any credibility calls regarding Mr. Circo, and that even if she did, Commissioner Kelly ignored the directive in *Davis* regarding the deference to be paid the ALJ's credibility determination by merely "rubber-stamping" the ALJ's decision.

■ Although the ALJ did not use the specific words "I believe Mr. Circo was lying" or "I find that Mr. Circo was not a credible witness," her inference that Mr. Circo staged his accident after falsely advising Dr. Whitaker that his knee condition had improved was a finding that Mr. Circo was, in fact, not a credible witness. In deferring to the ALJ's credibility determination, Commissioner Kelly was recognizing that the ALJ had Mr. Circo testify before her, and he was giving her findings the "considerable weight" mandated by the passage he quoted from *Davis*. Mr. Circo's third point is without merit.

Because the Commission's denial of compensation was supported by sufficient competent and substantial evidence in the record, and the award was not against the overwhelming weight of the evidence, the Commission's award is affirmed.

All concur.